**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| PENNECO OIL COMPANY, INC.,<br>PENNECO PIPELINE CORPORATION,<br><br>Plaintiffs,<br><br>v.<br><br>K. PETROLEUM, INC.,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 25-121 |

**MEMORANDUM OPINION**

Plaintiffs seek confirmation of two related arbitration awards. Defendant seeks *vacatur* of those arbitration awards. Specifically, Plaintiffs Penneco Oil Company, Inc. and Penneco Pipeline Corporation (collectively, "Penneco") filed a Complaint to Confirm Arbitration Awards and for the Entry of Judgment Pursuant to 9 U.S.C. § 9 (Docket No. 1), and Defendant K. Petroleum, Inc. ("KPI") filed a Motion to Vacate those Arbitration Awards pursuant to 9 U.S.C. § 10. (Docket No. 12)[1]. The parties have fully briefed these matters. (Docket Nos. 13, 14, 19, 27). For the reasons set forth herein, KPI's Motion to Vacate will be denied, the Arbitration Awards will be confirmed, and judgment will be entered in Penneco's favor.

## I. BACKGROUND[2]

The parties come before this Court with more than a decade-long history of business dealings with each other and a near equally lengthy history of conflict between them, culminating in the Final Award in Arbitration (the "Final Award") and Award of Attorneys' Fees and Costs

[1] KPI also filed a Partial Answer. (Docket No. 11).

[2] The Court presents an abbreviated version of the facts as the parties are well-acquainted with the background of this case. The Court also notes that the robust arbitral record is supplied at Docket Nos. 1-3 through 1-23 and 12-1 through 12-29.

and Additional Damages Pursuant to the November 25, 2024 Final Award in Arbitration (the "Award of Attorneys' Fees and Additional Damages") (collectively, the "Awards" or "Arbitration Awards") made by David B. White, Esq. ("Arbitrator White") in his capacity as the parties' Consented Special Master. (Docket Nos. 1-14, 1-23, 12-20, 12-25). Arbitrator White determined that KPI breached the Confidential Release and Settlement Agreement between it and Penneco dated June 1, 2022 ("Settlement Agreement"). (Docket Nos. 1-5, 12-5; 1-14; 12-20). That Settlement Agreement is at the heart of Arbitrator White's Arbitration Awards. It had followed a series of disputes arising from the parties' contractual relationship and prior litigation, including an earlier arbitration award and earlier decisions made in this Court by District Judge David Cercone and District Judge William Stickman. Each is summarized herein.

The first of the contracts at issue is known as the "Farmout Agreement," which, in essence, permitted KPI's predecessor in interest, Mountain V. Oil & Gas, Inc. ("Mountain V"), to drill natural gas wells within Penneco's Hackett Field, an 1,800+ acre leasehold in Washington County, Pennsylvania, in exchange for accessing Mountain V's "Gathering System" of lines and equipment for the gas that Penneco separately drilled. (Docket No. 1-3, 12-1). Penneco and Mountain V subsequently entered into a Drilling and Operating Agreement so that Mountain V could drill additional acreage held by Penneco in the Hackett Field in exchange for Penneco becoming a co-developer of Mountain V's Gathering System to carry gas from the wells to the market for sale. (Docket Nos. 1-4, 12-2). The Farmout Agreement is attached to, and is incorporated into, the Drilling and Operating Agreement. (Docket Nos. 1-3; 1-4; 1-5; 12-1; 12-2; 12-5). Section 21 of the Drilling and Operating Agreement contains the following arbitration provision:

> Any controversy or dispute involving this Agreement will be settled by arbitration … in accordance with the rules then followed by the American Arbitration Association, or any successor to the functions thereof. The arbitrators will have the right and authority to

> determine how their decision or determination as to each issue or matter in dispute may be implemented or enforced. Any decision or award of the arbitrators will be final and conclusive on the parties to this Agreement and there will be no appeal therefrom other than for gross negligence or willful misconduct. The losing party shall reimburse the winning party for its legal fees and the losing party shall pay for all other costs associated with the arbitration

(Docket Nos. 1-4, §21; 12-2 at §21).

KPI ultimately became Mountain V's successor in interest to the Gathering System in 2015, and shortly thereafter became embroiled in a dispute about it with Penneco. Penneco filed a demand for arbitration against KPI in 2016 and the parties selected Arbitrator Francis A. King to adjudicate it. In 2017, Arbitrator King issued an Interim Award and Order, a Modified Interim Award and Order, and a Final Award (collectively, the "King Award"), all in favor of Penneco. Penneco then filed in this Court a Complaint to Confirm Arbitration Award and for Entry of Judgment Pursuant to 9 U.S.C. §§ 9 and 13 in *Penneco Oil Company, Inc. v. K. Petroleum, Inc.*, Case No. 2:17-cv-1364 (Cercone, J.). KPI filed a Motion to Vacate the King Award in that case and Judge Cercone issued an Opinion and multiple Orders denying KPI's Motion to Vacate, granting Penneco's Motion for Judgment on the Pleadings, and entering judgment in Penneco's favor confirming the King Award. *See* Civil Action No. 2:17-cv-1364, ECF Nos. 24, 25, 26, 27 (W.D. Pa. Sept. 27, 2018). Notably, Judge Cercone determined that KPI was bound by the terms of both the Farmout Agreement and the Drilling and Operating Agreement. (Docket Nos. 1 at ¶ 4; 11 at ¶¶ 23-24; Civil Action No. 2:17-cv-1364, ECF No. 24 (W.D. Pa. Sept. 27, 2018)).

Disputes between KPI and Penneco persisted. In 2018, Penneco filed a lawsuit against KPI in Westmoreland County Court of Common Pleas, which KPI removed to federal court. This case proceeded to a bench trial on damages before Judge Stickman in August 2020. *See Penneco Pipeline Corporation and Penneco Oil Company, Inc.*, No. 2:18-cv-248 (J. Stickman). On January

13, 2021, Judge Stickman issued Findings of Fact, Conclusions of Law, and Award, along with a judgment in the amount of $511,292.15. (No. 2:18-cv-248, ECF Nos. 170, 171 (W.D. Pa. Jan. 13, 2021)).[3]

In 2021, due to another dispute, Penneco made a demand for arbitration and the parties mutually appointed Arbitrator White to resolve that dispute. Prior to evidentiary hearings in that case, the parties reached a mediated settlement memorialized by their Settlement Agreement dated June 1, 2022. (Docket Nos. 1-5 and 12-5). Relevant here, the parties agreed to certain rights and responsibilities involving the replacement of the Hackett Field Compressor as follows:

> **Replacement of Compressor**. KPI intends to replace the current Hackett Field Compressor with a compressor of greater capacity at a future date. The Parties agree that if and when KPI replaces the compressor in the future, KPI shall charge, and Penneco shall pay, 70% of the total cost and related expenses to change out and replace the existing compressor for the new larger compressor. KPI agrees that it will provide Penneco copies of all records, invoices and/or documents substantiating all such compressor replacement costs upon request for payment. Penneco's agreement to pay 70% of the compressor replacement costs is a one-time agreement only for the current compressor replacement and shall not be construed as an agreement to pay 70%, or any other set amount, for any additional compressor replacements that may be made by KPI or its successors in the future. Aside from this one-time agreement only for the current compressor replacement, all monthly and future compression charges shall continue to be allocated pro rata pursuant to the February 23, 2007 Drilling and Operating Agreement, including the 2006 Farmout Agreement which was attached and made part thereto (the "**Drilling and Operating Agreement**").

---

[3] On February 4. 2021, Penneco filed a Motion for Contempt and/or Motion for Relief Pursuant to Fed. R. Civ. P. 70. (No. 2:18-cv-248, ECF No. 175). Judge Stickman entered a Memorandum Order of Court on July 14, 2021, denying this motion. (*Id.*, ECF No. 199). Penneco appealed Judge Stickman's denial of its motion. *See* No. 2:18-cv-248 (ECF No. 200) and USCA Case No. 21-2511. The Third Circuit scheduled oral argument for June 15, 2022, but the parties subsequently filed a Stipulation to Dismiss Case and the Third Circuit dismissed the appeal on June 7, 2022. This Court notes that Penneco previously filed a Motion for Contempt against KPI before Judge Cercone which Judge Cercone denied. *See* Civil Action No. 17-cv-1364, ECF Nos. 28 and 38. *See also* No. 2:18-cv-248, ECF No. 199 at 6 n. 1.

(Docket Nos. 1-5 and 12-5, § II (D) (emphasis in original)). Another relevant material term of this Settlement Agreement is the following provision pertaining to airfare costs:

> **Airfare Costs**. KPI will immediately cease charging Penneco for any and all airfare costs and expenses, including but not limited to "air travel rates" that KPI has been charging to Penneco. Penneco reserves its right under the Drilling and Operating Agreement to dispute any other costs charged by KPI with respect to the operation and/or maintenance of the compressor.

(*Id.*, § II (G)). The parties also agreed to appoint Arbitrator White as the "Consented Special Master" to resolve future disputes between them:

> **Appointment of "Consented Special Master".** The Parties agree that Mr. White shall be appointed as a "Consented Special Master" that the Parties agree will have the authority to resolve all future disputes between Penneco and KPI arising under or relating to this Agreement, the Drilling and Operating Agreement, any Orders entered by Judge Cercone in the Action to Confirm or any Orders entered by Judge Stickman in the Second WDPA Action. Mr. White's authority as the Consented Special Master shall also include the authority to award a prevailing party its attorneys' fees and costs in accordance with Section 21 of the Drilling and Operating Agreement. In the event Mr. White resigns or is otherwise unable to continue as the Consented Special Master, the Parties agree that they shall mutually agree on the appointment of a successor.

(*Id.*, § II (J)). Finally, the parties agreed that the Settlement Agreement would be "attached to, made part of and incorporated into" the Drilling and Operating Agreement. (*Id.*, § II (J)). As noted above, the Farmout Agreement is also attached to and incorporated into the Drilling and Operating Agreement. (Docket Nos. 1-4 and 12-2).

Then, in May 2023, Penneco submitted its most recent claim to Arbitrator White as the Consented Special Master asserting that KPI breached both the Drilling and Operating Agreement and the Settlement Agreement. (Docket Nos. 1-6, 12-12). After the parties submitted and exchanged many pre-hearing filings, Arbitrator White held evidentiary hearings on November 4-5, 2024, and the parties submitted post-hearing briefs thereafter. (Docket No. 1, ¶¶ 39-49).

After these proceedings concluded, Arbitrator White issued his Final Award on November 25, 2024, holding, in part, that KPI breached Section II (D) of the Settlement Agreement for "adding a second compressor as opposed to replacing the existing compressor with a compressor of greater capacity" and for improperly charging Penneco for several expenses associated with the second compressor. (Docket Nos. 1-14; 12-20). Arbitrator White further determined that KPI improperly charged Penneco for: its share of USA Compression's Service Agreements for two compressors when Penneco should only have been charged for one; labor charges to observe two compressors when there should only be one; insurance premiums for two compressors when there should only be one; and the cost of quarterly stack (air quality emissions) testing from two compressors when there should only be one. (*Id.*, ¶ 2(a)-(d)). Arbitrator White's Final Award also determined that KPI breached Section 6 of the Farmout Agreement and Section 4(e) of the Drilling and Operating Agreement by charging Penneco "undocumented and excessive labor charges (at times for two individuals), instead of the contractually agreed upon actual 'documented cost of compression.'" (*Id.*) In making these findings, Arbitrator White awarded Penneco monetary damages and interest in the amount of $370,456. (Docket Nos. 1-14; 12-20). Additionally, and pursuant to Section II (D) of the Settlement Agreement, Arbitrator White directed KPI to remove the two compressors and install a single compressor of greater capacity at KPI's own costs because Penneco had already paid $89,594 for a replacement compressor that KPI failed to install. (*Id.*).

In addition to the foregoing, Paragraph 3 of Arbitrator White's Final Award also ordered:

> Going forward from June 2024, [KPI] may only charge [Penneco] 0.5 hours per day for three (3) days a week to observe a single compressor at a rate not to exceed $75/hour. To the extent exigent circumstances cause the need for additional labor, [KPI] may charge [Penneco] for the actual cost of the necessary labor and must provide specific documentation of said labor along with an explanation of the specific occurrence which caused the need for the extra labor charge.

(Docket Nos. 1-14; 12-20). Pursuant thereto, Penneco subsequently submitted a Motion for Additional Damages Awarded Pursuant to the November 25, 2024 Final Award in Arbitration ("Motion for Additional Damages") for excessive compressor labor charges for the months of June and July 2024, seeking an additional $160,582.38. (Docket Nos. 1, ¶¶ 63-64; 1-16 and 12-21). KPI submitted a Response opposing these additional damages. (Docket Nos. 1, ¶ 69; 1-18 and 12-22). Penneco submitted a Reply. (Docket Nos. 1, ¶ 70; 1-19 and 12-23). KPI submitted a Sur-Reply. (Docket Nos. 1, ¶ 72; 1-22 and 2-24).

Lastly, Arbitrator White also determined that KPI must reimburse Penneco its attorneys' fees and costs as the winning party in the arbitration and his Final Award outlined a procedure for Penneco to substantiate recoverable fees and costs and for KPI to object thereto. (*Id.*). Pursuant to that process, Penneco filed a Statement of Attorneys' Fees and Costs requesting $272,504.15. (Docket Nos. 1, ¶ 62; 1-15; 1-15 and 12-28). KPI submitted a Response opposing any award of attorneys' fees and costs. (Docket Nos. 1, ¶ 68; 1-17 and 12-29). Penneco submitted a Reply. (Docket Nos. 1, ¶ 71; 1-20). KPI submitted a Sur-Reply. (Docket Nos. 1, ¶ 72; 1-21).

On January 27, 2025, Arbitrator White issued his Award of Attorneys' Fees and Additional Damages in favor of Penneco, awarding attorneys' fees in the amount of $195,811.50, itemized costs in the amount of $5,997.65, expert witness testimony and costs for the services provided by Jerome Schmitt of Gleason & Associates Inc. in the amount of $69,595, and $1,100 for the interim arbitration invoice. (Docket Nos. 1, ¶¶ 73-76; 1-23 and 12-25). This Award of Attorneys' Fees and Additional Damages also directed KPI to reimburse Penneco for the itemized monthly charges associated with the second compressor in the amount of $147,678 and for excess labor charges in the amount of $12,904.38 for the months of June and July 2024. (*Id.*). Therefore, the total amount of the combined Awards is $803,542.53. (Docket Nos. 1, ¶ 77; 1-14; 1-23; 12-20; 12-25).

Par for the course, the parties dispute these arbitral determinations and once again turn to federal court to adjudicate whether Arbitrator White's Awards should be confirmed or vacated. As the United States Court of Appeals for the Third Circuit has put it: "It's a steep climb to vacate an arbitration award." *France v. Bernstein*, 43 F.4th 367, 377 (3d Cir. 2022). KPI does not successfully make that steep climb here.

## II. **DISCUSSION**

### A. Standards for Confirming and Vacating Arbitration Awards.

The Federal Arbitration Act ("FAA") provides "mechanisms for enforcing arbitration awards: a judicial decree confirming an award, an order vacating it, or an order modifying or correcting it." *Hall Street Associates, L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 582 (2008) (citing 9 U.S.C. §§ 9-11). Under Section 9 of the FAA, a court "must" confirm an arbitration award "unless" it is vacated, modified, or corrected "as prescribed" in Sections 10 and 11. *See* 9 U.SC. § 9. Section 10 provides the grounds for vacating awards, while Section 11 provides the grounds for modifying or correcting them. *See* 9 U.S.C. §§ 10, 11.

Specifically, Section 10(a) provides that an arbitration award may be vacated:

> (1) Where the award was procured by corruption, fraud or undue means.
>
> (2) Where there was evident partiality or corruption in the arbitrators . . ..
>
> (3) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.
>
> (4) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a)(1)-(4)[4].

Penneco contends that the parties agreed upon narrower contractual standards of review that control this dispute. Specifically, Penneco points to Section 21 of the Drilling and Operating Agreement, which provides, in pertinent part, that "[a]ny controversy or dispute involving this Agreement will be settled by arbitration . . . Any decision or award of the arbitrators will be final and conclusive on the parties to this Agreement and there will be *no appeal therefrom other than for gross negligence or willful misconduct*." (Docket No. 1-4, §21) (emphasis added). Penneco asserts that "gross negligence or willful misconduct" is the "controlling standard" here (Docket No. 19, p. 17), but does not cite to any case law supporting this assertion that such contractual terms override Section 10 of the FAA. For its part, KPI points to a 2009 opinion from the Eastern District of Pennsylvania that quotes a 2003 Second Circuit decision, concluding that ". . . parties may not, by private agreement, relieve them of their obligation to review arbitration awards for compliance with §10(a)." (Docket No. 27, p. 6) (citing *Silicon Power Corp. v. General Elec. Zeneth Controls, Inc.*, 661 F. Supp. 2d 524, 538 (E.D. Pa. 2009) (quoting *Hoeft v. MVL Group, Inc.*, 343 F.3d 57, 64-65 (2nd Cir. 2003))). However, neither party adequately answers the critical question of whether current controlling authority permits or prohibits parties from contractually supplanting the standards for judicial review for vacatur found in Sections 10 and 11 of the FAA. As it turns out, the Supreme Court decided this issue long ago when it held in 2008 that Sections

---

4 Section 11 of the FAA provides that a court may "make an order modifying or correcting the award upon the application of any party to the arbitration – (a) Where there was an evident material miscalculation of figures or an evidence material mistake in the description of any person, thing, or property referred to in the award. (b) Where the arbitrators have awarded upon a matter not submitted to them . . .. (c) Where the award is imperfect in matter of form not affecting the merits of the controversy. The order may modify and correct the award, so as to effect the intent thereof and promote justice between the parties." 9 U.S.C. §11. This provision is not germane to the instant dispute.

10 and 11 of the FAA provide the exclusive grounds for vacatur.[5] *Hall Street Assoc., L.L.C.*, 552 U.S. at 583, 587 ("We now hold that §§ 10 and 11 respectively provide the FAA's exclusive grounds for expedited vacatur and modification" and "On application for an order confirming the arbitration award, the court 'must grant' the order 'unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title.' There is nothing malleable about 'must grant,' which unequivocally tells courts to grant confirmation in all cases, except when one of the 'prescribed' exceptions applies. This does not sound remotely like a provision meant to tell a court what to do just in case the parties say nothing else.") (Overruling *Roadway Package Sys., Inc. v. Kayser*, 257 F.3d 287, 288 (3d Cir. 2001); *see Oberwager v. McKechnie Ltd.*, 351 Fed. Appx. 708, 710 n. 4 (3d Cir. 2009) ("It is therefore uncontested that *Hall Street* abrogates one holding of *Roadway*, that parties to agreements subject to the FAA can specifically contract out of the FAA standards for review."). *See also Sutter v. Oxford Health Plans LLC*, 675 F.3d 215, 219 (3d Cir. 2012) (stating that the grounds set forth in Section 10(a) of the FAA "are exclusive and may not be supplemented by contract") (aff'd on other grounds, 569 U.S. 564). Accordingly, this Court will apply Section 10(a)(3) and (4) of the FAA without regard to the presumptively narrower standard of "gross negligence or willful misconduct" contained in Section 21 of the parties' Drilling and Operating Agreement.

This Court must nonetheless apply an "extremely deferential" standard of review even when applying Section 10(a) of the FAA rather than Penneco's asserted contractual standard.

[5] The Supreme Court clarified, however, that "[i]n holding that §§ 10 and 11 provide exclusive regimes for the review provided by the statute, we do not purport to say that they exclude more searching review based on authority outside the statute as well. The FAA is not the only way into court for parties wanting review of arbitration awards: they may contemplate enforcement under state statutory or common law, for example, where judicial review of different scope is arguable. But here we speak only to the scope of the expeditious judicial review under §§ 9, 10, and 11, deciding nothing about other possible avenues for judicial enforcement of arbitration awards." *Hall Street Associates, L.L.C.*, 552 U.S. at 576. Here, Penneco seeks to confirm the Awards pursuant to the FAA and KPI seeks to vacate them pursuant to the FAA and not pursuant to Pennsylvania statutory or common law.

*Indep. Lab'y Emps.' Union, Inc. v. ExxonMobil Research. & Engineering Co.*, 11 F.4th 210, 215 and n. 27 (3d Cir. 2021) (citing Section 10(a) of the FAA). The "court's function in confirming or vacating [an arbitration] award is severely limited" and there is a "strong presumption" in favor of an arbitration award. *Mutual Fire, Marine & Inland Ins. Co. v. Norad Reinsurance Co.*, 868 F.2d 52, 56 (3d Cir. 1989). The grounds upon which this Court may vacate an arbitration award generally are understood to be "narrow in the extreme." *Amalgamated Meat Cutters & Butcher Workmen of N. Am., Local 195 v. Cross Brothers Meat Packers, Inc.*, 518 F. 2d 1113, 1121 (3d Cir. 1975). "[A court] will 'vacate [an award] only under [the] exceedingly narrow circumstances' listed in 9 U.S.C. § 10(a)." *Freeman v. Pittsburgh Glass Works, LLC*, 709 F.3d 240, 251 (3d Cir. 2013) (alterations in original) (quoting *Dluhos v. Strasberg*, 321 F.3d 365, 370 (3d Cir. 2003)). Moreover, the party seeking to vacate an award, KPI, bears the burden of proving that *vacatur* is appropriate. *Silicon Power Corp.*, 661 F. Supp. 2d at 536.

Despite this highly deferential standard, the Court's role is not simply to "rubber stamp" the arbitrator's decisions. *Matteson v. Ryder System, Inc.*, 99 F.3d 108, 113-14 (3d. Cir. 1996); *Leed Architectural Prods., Inc. v. United Steelworkers of America, Local 6674*, 916 F.2d 63, 65 (2d Cir. 1990) ("This great deference, however, is not the equivalent of a grant of limitless power."). An award may be set aside where there is "evident partiality" to one party that gives rise to "a clear showing of bias." *Dauphin Precision Tool v. United Steelworkers of Am.*, 338 Fed. Appx. 219, 223 (3d Cir. 2009). Fraud, misconduct, or violation of public policy are additional grounds for invaliding the arbitrator's assessment. *Rite Aid of New Jersey v. United Food and Commercial Workers Union, Local 1360*, 2011 WL 5920939, at * 3 (D.N.J. Nov. 28, 2011). In contrast, however, an arbitrator's interpretation of an agreement cannot be overturned simply because there is a basis to disagree with that interpretation. A court does not review the award to

ascertain whether the arbitrator applied the correct principles of law, made a factual error, or incorrectly assessed credibility of witnesses or the weight of testimony. *See News America Publications, Inc. v. Newark Typographical Union, Local 103*, 918 F.2d 21, 24 (3d Cir. 1990), aff'd 918 F.2d 21 (remanding with instructions to affirm the arbitration award), denying petition for rehearing, 921 F.2d 40 (3d Cir. 1990). In other words, "if an arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, the fact that a court is convinced he committed serious error does not suffice to overturn his decision." *Akers National Roll Co. v. United Steel, Paper and Forestry, Rubber, Mfg., Energy, Allied Industrial and Service Workers International Union, et al.*, 712 F.3d 155, 160 (3d Cir. 2013) (quoting *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001) (*per curiam*) (internal quotation marks and citation omitted)). Such errors, be they of fact or law, are an inherent risk that comes with the benefits gained by arbitration. *Id.* ("[w]hen parties knowingly and voluntarily bargain for arbitration to resolve disputes, they receive the benefits of fast results and reduced dispute-resolution expenses" but "[t]hese benefits, however, do not come without risk, and 'the possibility of receiving inconsistent or incorrect rulings without meaningful appellate review of the merits is one of the risks such parties must accept when they choose arbitration over litigation'") (quoting *Major League Umpires Association v. American League of Professional Baseball Clubs*, 357 F.3d 272, 289 (3d Cir. 2004)). As the Supreme Court has held, "[i]t is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation is different from his." *Akers National Roll Co.*, 712 F.3d at 161 (quoting *United Steel Workers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 599 (1960)).

B. KPI's Challenges to the Arbitration Awards.

KPI seeks to vacate the Arbitration Awards pursuant to Sections 10(a)(3) and 10(a)(4) of the FAA. KPI principally contends that Arbitrator White exceeded his authority in not disallowing portions of Penneco's claim related to the second compressor installed at the Hackett Field. KPI also contends that Arbitrator White refused to consider testimony from KPI employee Joel Greco, ignored well-settled rules of contract law, and awarded damages that were not sought nor established and which were otherwise "completely irrational." Finally, KPI contends that Arbitrator White's Attorneys' Fee Award is also "completely irrational." Each argument is addressed in turn.

1. Did Arbitrator White Exceed His Authority by Adjudicating Penneco's Second Compressor Claim?

A court may vacate an arbitration award when an arbitrator exceeds his or her authority. Here, KPI asserts that Arbitrator White exceeded his authority by accepting and sustaining aspects of Penneco's second compressor claim and then by determining that KPI breached Section II (D) of the Settlement Agreement when it installed the second compressor. This Court disagrees.

The Third Circuit instructs that the FAA permits courts to vacate awards when arbitrators exceed their powers, stating:

> Arbitration under the [FAA] is a matter of consent, not coercion, and parties are generally free to structure their arbitration agreements as they see fit. By contractually restricting the issues they will arbitrate, the individuals with whom they will arbitrate, and the arbitration procedures that will govern, parties to an arbitration agreement may place limits upon the arbitrator's powers that are enforceable by the courts. An arbitrator oversteps these limits, and subjects his award to judicial vacatur under §10(a)(4), when he decides an issue not submitted to him, grants relief in a form that cannot be rationally derived from the parties' agreement and submissions, or issues an award that is so completely irrational that it lacks support altogether. In order words, the task of an arbitrator is to interpret and enforce a contract. When he makes a good faith

> attempt to do so, even serious errors of law or fact will not subject his award to vacatur. But when the arbitrator strays from interpretation and application of the agreement and effectively dispenses his own brand of industrial justice, he exceeds his powers and his award will be unenforceable.

*Sutter*, 675 F.3d at 219-220 (internal citations and quotations omitted). Indeed, an arbitrator may not venture beyond the bounds of his or her authority, and as is often the case, "the authority of the arbitrator is defined not simply by the . . . agreement, but is determined in large measure by the parties' submissions." *Matteson v. Ryder System Inc.*, 99 F.3d 108, 112 (3d Cir. 1996) (internal citations and quotations omitted). It is the responsibility of the arbitrator in the first instance to interpret the scope of the parties' submission. *Matteson v. Ryder Sys. Inc.*, 99 F.3d 108, 113 (3d Cir. 1996) (citing *Mobil Oil Corp. v. Independent Oil Workers Union*, 679 F.2d 299, 302 and n. 1 (3d Cir. 1982) (citing cases)). Moreover, a reviewing court should presume that an arbitrator acted within the scope of his or her authority. *Metromedia Energy, Inc. v. Enserch Energy Services, Inc.*, 409 F.3d 574, 580 (3d Cir. 2005).

Here, the parties contractually agreed to vest Arbitrator White with the authority to adjudicate "all future disputes" between them "arising under or relating to this [Settlement] Agreement, the Drilling and Operating Agreement, any Orders entered by Judge Cercone . . . and Judge Stickman[,]" including Penneco's second compressor claim. (Docket Nos. 1-5 and 12-5, §II (I)). Section 21 of their Drilling and Operating Agreement similarly covers such disputes by providing arbitration for "[a]ny controversy or dispute involving this Agreement . . . [t]he arbitrators will have the right and authority to determine how their decision or determination as to each issue or matter in dispute may be implemented or enforced . . .." (Docket Nos. 1-4 and 2-2, §21). And, as noted above, Section II (I) of their Settlement Agreement provides, in relevant part, that Arbitrator White shall be appointed as the Consented Special Master authorized to resolve all

such future disputes between them, including "the authority to award a prevailing party its attorneys' fees and costs . . .." (Docket Nos. 1-5 and 12-5, §II (I)). Clearly, Penneco's second compressor claim alleging a breach of Section II (D) of the Settlement Agreement and seeking attendant attorneys' fees and costs is a "controversy or dispute" between it and KPI covered by Section 21 of Drilling and Operating Agreement and is a "dispute" with KPI "arising under or relating to" the Settlement Agreement. This point is indisputable.

In its Reply filed with this Court, KPI clarifies that it "never posited the Arbitrator lacked the authority to decide the second compressor claim" (Docket No. 27, p. 2), but it does assert that Arbitrator White should not have decided the second compressor claim "in *this* proceeding." (Docket No. 27, p. 2) (citing Docket No. 13, p. 23 n. 12 (emphasis in original) and Docket No. 12-24, p. 5). In advancing this argument, KPI characterizes Penneco's demand for arbitration myopically and suggests the second compressor issue fell outside of the parties' submissions to Arbitrator White. The Court disagrees.

First, Penneco's demand for arbitration expressly asserted KPI's alleged contractual breaches of Section II (D) of the Settlement Agreement, Section 4(e) of the Drilling and Operating Agreement, and Section 6 of the Farmout Agreement. By KPI's telling, one would think that Penneco's demand had little if anything to do with a second compressor. In reality, Penneco's demand for arbitration put KPI on notice of the general nature of its compressor claim, asserting a breach of Section II (D) of the Settlement Agreement, which is entitled "Replacement of Compressor" and expressly addresses the parties' respective rights and duties pertaining to the replacement of a compressor in the Hackett Field. This demand was made amidst the parties' ongoing business relationship, and for which the factual circumstances surrounding the compressors at the Hackett Field were readily known to KPI. Penneco's second compressor claim

as ultimately adjudicated by Arbitrator White was not a separate, distinct, and unrelated claim. Rather, the essence or gist of its claim, as initially articulated and as ultimately adjudicated, always involved the parties' respective duties and responsibilities pertaining to compression at the Hackett Field and Penneco's assertion that KPI breached of Section II (D) of the Settlement Agreement concerning the installation and costs of such compressors.

KPI also complains that the parties "proceeded through discovery and KPI prepared its case for presentation for over seventeen (17) months addressing only that specific claim [that KPI's internal labor expenses incurred for purposes of maintaining the [compressor] were excessive." (Docket No. 13, pp. 20-21). KPI's assertion that it had no opportunity to investigate the part of Penneco's claim related to the second compressor issue or otherwise discern the nature and extent of the second compressor claim through written discovery and depositions is meritless. Indeed, KPI already would have been the most knowledgeable party as to its installation of a replacement compressor or of a second compressor and the expenses pertaining thereto. It could have fleshed out a better understanding of Penneco's theories of liability and damages had it taken even a modicum of discovery. That appears to have been a tactical or business decision on KPIs part.[6] No matter, for the issue at hand is whether the claim was properly submitted to and thus within Arbitrator White's province to adjudicate. It was.

This Court finds that Penneco's demand for arbitration as initially articulated fairly encompasses the second compressor claim, particularly when reviewed in the context of the parties' ongoing business and contractual relationship and the substance of their subsequent submissions to Arbitrator White throughout this arbitral proceeding. *See Giant Eagle, Inc. v. United Food & Com. Workers Union Loc. 23*, 547 F. App'x 106, 110 (3d Cir. 2013) ("We have

---

[6] It is notable that KPI opposed Penneco's efforts during discovery to "inspect and video" the Hackett Field compressors. (Docket No. 1-19, pp. 21-24).

cautioned against "attach[ing] too great significance to documents drafted early in the dispute," such as the initial grievance, and observed that the issues to be decided are those reflected in the evidence and arguments of the parties at the arbitration hearing") (citing *Matteson*, 99 F.3d at 114-115).

Second, and notwithstanding the initial imprecision with which Penneco articulated its demand for arbitration and KPI's election not to avail itself of even minimal discovery, KPI argued to Arbitrator White that Penneco waited too long to raise this second compressor claim, asserting that Penneco raised this theory of liability and damages for the first time merely three weeks before Arbitrator White's evidentiary hearing, and even then, only in the last paragraph of its twenty-one page pre-hearing Narrative of Claims. (Docket No. 13, p. 14) (referencing Docket No. 12-13)). Upon this Court's independent review of Penneco's pre-hearing Narrative of Claims, however, it is plainly evident that KPI mischaracterizes Penneco's arbitral submission. In fact, the very first paragraph of Penneco's description of claims beginning on page 10 of its Narrative of Claims clearly states: "Penneco does not dispute that KPI can allocate legitimate documented charges for the operation and/or maintenance of a single compressor to Penneco under Section 6 of the Farmout Agreement and Section 4(e) of the [Drilling and Operating] Agreement. Penneco does challenge however that *KPI improperly installed the second compressor and has engaged in abuse with respect to its internal labor charges to Penneco*." (Docket Nos. 1-10 and 12-13, p. 10) (emphasis added). Penneco explains its second compressor claim in detail throughout the ensuing eleven pages of that submission. (*Id.*). In fact, Penneco's Narrative of Claims asserted that: (i) KPI breached the Drilling and Operating Agreement by imposing improper, excessive, and undocumented labor charges for the alleged operation and/or maintenance of the "Hackett Compressors"; (ii) KPI improperly charged inflated labor rates; (iii) KPI improperly charged for

alleged work performed by KPI's President/CEO; and (iv) KPI breached Section II (D) of the Settlement Agreement and violated a prior Order of Judge Cercone when KPI added a second compressor and charged Penneco for it. (Docket Nos. 1-10 and 12-13).

Then, in response to Penneco's pre-hearing Narrative of Claims, KPI submitted its own Pre-Hearing Narrative in which it had a full opportunity to address Penneco's claims, including the second compressor claim, as it saw fit. (Docket Nos. 1-11 and 12-15). In fact, in a section of that submission entitled "Penneco's Claims," KPI asserts that Penneco waited too long to challenge the disputed charges, stating: "And now, it has taken them another year and a half to present this *imminently straightforward argument* to the parties['] [sic] appointed arbitrator." (Docket Nos. 1-11 and 12-15, p. 11) (emphasis added). KPI proceeded, then, over the course of ten pages, to advance substantive defenses to Penneco's claims under the following subheadings:

- "Allocation of costs for operation and maintenance of compressor."
- "Labor expended to monitor, operate and maintain the compressors is necessary and comprises the appropriate costs of compression."
- "Documentation of KPI's labor costs."
- "Costs and expenses relative to the second compressor were properly allocated between the parties' [sic] consistent with the Operating and Settlement Agreements."
- "KPI's labor rates are reasonable and appropriate."

(*Id*., pp. 11-21). Indeed, KPI submitted its Pre-Hearing Narrative addressing Penneco's second compressor claim on the merits and then proceeded with the hearing as scheduled without a request for a postponement, bifurcation, or severance to adjudicate the second compression claim in a separate arbitration proceeding.

From reading the parties' respective pre-hearing submissions to Arbitrator White, it is clear that KPI was well-aware of Penneco's second compressor claim in advance of the hearing and supplied substantive defenses to it. The only place within its 21-page pre-hearing submission in which KPI objects to the second compressor claim is found in one sentence buried on page 19 amid its substantive defenses to Penneco's second compressor claim in which KPI states: ". . . the come-lately claim about a second compressor is not a proper subject of this upcoming proceeding and appears to be another attempt for Penneco to inflate its claimed damages. Regardless . . .." (*Id*., p. 19). Again, at no point in KPI's pre-hearing submission did it ask Arbitrator White to preclude testimony or argument about Penneco's second compressor claim at the upcoming hearing, nor did KPI separately ask Arbitrator White to postpone the hearing itself or to sever or bifurcate the second compressor claim from other aspects of Penneco's claim that KPI breached Section II (D) of the Settlement Agreement. Why would it? The parties agreed to use Arbitrator White for future disputes concerning its Settlement Agreement, including for disputes such as this one, and KPI's pre-hearing submission, when read in its entirety, plainly addresses the merits of the second compressor claim head-on, arguing essentially that Penneco seemingly undermined or waived its second compressor aspect of its claim by its delay in challenging costs and expenses paid in conjunction with a second compressor. When read in context, there was nothing in the arbitral record at this juncture to give Arbitrator White the sense that the second compressor claim was not submitted to him or that it somehow was beyond his arbitral authority to decide along with other aspects of Penneco's contention that KPI breached Section II (D) of the Settlement Agreement.

The evidentiary hearing took place as scheduled. Once again, KPI did not object to proceeding nor did it seek a continuance, bifurcation, or severance of Penneco's second

compressor claim. In its briefing before this Court, KPI recounts lay and expert witness testimony it presented or otherwise elicited at the arbitration hearing to defend against Penneco's compressor-related claims. (Docket No. 13, pp. 14-16). Yet KPI asserts that it was prejudiced by the late assertion of Penneco's second compressor claim. It is telling, however, that KPI addressed the second compressor claim in its Prehearing Narrative (Docket Nos. 1-11 and 12-15), at the hearing itself, and in its Post-Hearing Summary, dedicating the entirety of Section IV of that post-hearing submission ("Penneco's Claim Relative to the Second Compressor") to it. (Docket Nos. 1-13 and 12-19). Notably, KPI had the foresight and ability to secure and submit to Arbitrator White the expert report of Denny Harton (Docket No. 12-17), along with its Prehearing Narrative, both of which addressed the second compressor claim. KPI then presented Mr. Harton at the hearing as one of its two live witnesses. (Docket No. 12-19). KPI also prepared for and actively cross-examined Penneco's CEO, Mr. Wallace, and asserted such testimony in support of its defenses addressed in its Post-Hearing Summary. (Docket Nos. 1-13 and 12-19). And, finally, KPI presented testimony from its own CEO, Mr. Khorrami, in further support of its substantive defenses to Penneco's second compressor claim.

A main thrust of the arguments KPI made to Arbitrator White in its defense against the second compressor claim was that Penneco waited too long to assert the purported breach of Section II (D) of the Settlement Agreement for KPI's installation of a second compressor rather than replacing the existing, smaller one, with a larger compressor, and thus waived that aspect of its claim. Amid KPI's several-page defense of its installation of a second compressor in its Post-Hearing Summary, KPI states that it "has been profoundly prejudiced, with no opportunity to investigate it. As such, *the claim should be summarily denied*." (Docket Nos. 1-13 and 12-19, p. 13) (emphasis added). Yet, KPI defends itself on the merits. For instance, KPI notably argued to

Arbitrator White that "a seminal issue which was extensively discussed and negotiated during the February 22, 2022 mediation [that preceded the parties' Settlement Agreement] was increasing the Hackett Gathering System's compression capacity. During the course of the ten-hour mediation, [KPI's CEO] Khorrami contacted representatives of [USA Compression] for purposes of assessing the availability of compressors which possessed capacities sufficient to allow the parties' respective wells to produce unrestricted . . . Given the timeline in which Penneco demanded restrictions be removed from the Penneco Wells – *i.e.*, less than three weeks – and the lack of immediate availability of a single compressor large enough to accommodate full-flow from the parties' wells, KPI secured a second compressor which was installed in the Hackett Gathering System." (Docket No. 12-19, p. 11) (internal citations omitted). The parties ultimately entered into their Settlement Agreement approximately four months later. As noted above, Section II (D) of the Settlement Agreement is entitled "Replacement of Compressor" and it expressly provides that "KPI intends to replace the current . . . [c]ompressor with a compressor of greater capacity at a future date. The Parties agree that if and when KPI replaces the compressor in the future, KPI shall charge, and Penneco shall pay, 70% of the total cost and related expenses to change out and replace the existing compressor for the new larger compressor . . .." (Docket Nos. 1-5 and 12-5, § II (D)).

It is simply disingenuous for KPI to suggest that Penneco's second compressor claim had not been submitted to Arbitrator White for his consideration pursuant to his contractual authority as the parties' "Consented Special Master" or that such submission was done without its awareness and opportunity to rebut. Again, in context, it is plainly evident that KPI was making a full-throated contractual defense and not a procedural one, ultimately urging Arbitrator White to summarily deny the claim on the merits rather than to bifurcate or sever the claim. Indeed, the

parties fully ventilated Penneco's second compressor claim on the merits in their evidentiary presentations and written submissions to Arbitrator White. Arbitrator White himself recognized KPI's spurious "prejudice" argument and addressed it at length in his Award of Attorneys' Fees and Additional Damages, which bears restating at length:

> Finally, the undersigned Arbitrator would like to address [KPI's] claim that the undersigned should vacate the Award pertaining to charges regarding the second compressor because [KPI] was somehow prejudiced by [Penneco's] claims regarding the installation of the second compressor by not formally asserting them until [Penneco] filed [its] Pre-Hearing Narrative on October 14, 2024. This assertion, too, is without merit.
>
> First, after becoming aware of [Penneco's] assertion of the second compressor claims, [KPI] filed its Pre-Hearing Narrative. Nowhere in [KPI's] twenty-one (21) page submission did [KPI] request the Arbitration hearing should be postponed so it could adequately prepare to address these claims. Moreover, it appeared to this Arbitrator, that [KPI] did, in fact, adequately present its counter to these claims. [KPI's] counsel spent considerable time cross-examining Mr. Wallace on these claims and also offered testimony of its expert, Denny Harton, and Mr. Khorrami to refute the second compressor claims. Further, nothing at the two-day hearing prevented [KPI] from raising legal arguments of estoppel, waiver or modification. For whatever reason, these legal arguments first surfaced after the issuance of my [Award].
>
> Additionally, pursuant to Section (II)(I) of the Settlement Agreement, the Parties jointly requested that the undersigned serve as "Consented Special Master" and would have the authority to resolve all disputes between the Parties. I must remind [KPI] that on <u>several</u> occasions during our pre-hearing conferences, [KPI] implored me to "streamline" the dispute process and not to adhere to conventional, formal litigation protocols or procedures. Frankly, I am quite puzzled at the assertion that [KPI] was "ambushed" at the presentation of these claims and that the undersigned lacked the authority to resolve these issues.

(Docket Nos. 1-23 and 12-25) (emphasis in original).

Based upon the foregoing, Penneco's second compressor claim was undoubtedly submitted to Arbitrator White within the clear scope of his arbitral authority and that KPI had a full

opportunity to present its defenses concerning it and in fact did so. KPI did not seek to postpone, bifurcate, or severe this aspect of Penneco's claim. Instead, KPI clearly endeavored to rebut it on the merits and lost. On this record, the Court concludes that Penneco's second compressor claim clearly was submitted to Arbitrator White and that he did not exceed his authority when he adjudicated it and issued the resulting Arbitration Awards.

2. Did Arbitrator White Commit "Misconduct" by Refusing Evidence of KPI Employee Joel Greco?

KPI separately argues that the Arbitration Awards should be vacated pursuant to §10(a)(3) of the FAA because Arbitrator White was "guilty of misconduct" by refusing to consider certain evidence, specifically the transcript of deposition testimony of KPI's employee Joel Greco. (Docket No. 12-16). KPI argues that Arbitrator White procedurally erred[7] by excluding Mr. Greco's submitted testimony. The Court disagrees.

In advance of the arbitration hearing, Arbitrator White invited and then received the parties' proposals for an evidentiary hearing protocol. For its part, KPI advocated to Arbitrator White that the hearing protocol "not be constrained by those attributes of typical litigation, e.g., multiple witnesses, direct and cross-examination . . . Penneco proposes that you conduct a traditional hearing on November 4 (and 5), including multiple witnesses, including experts . . . KPI respectfully disagrees . . . KPI urges you to conduct the proceedings that are scheduled for November 4 simply by hearing and viewing presentations from the attorneys for the parties in this case and up to one (1) party representative." (Docket No. 1-19, pp. 26-31). Arbitrator White issued his final pre-hearing Order mindful of KPI's insistence that the arbitration hearing not be like

---

[7] Section 10(a)(3) uses the unfortunate language "guilty of misconduct" and "other misbehavior." 9 U.S.C. § 10(a)(3). In its Supplement to Motion to Vacate, however, KPI makes clear that it "does *not* assert or otherwise imply [Arbitrator White] engaged in any dishonorable actions or was motivated by any improper purpose" and that it does not "challenge or impugn the competence or motivations of [Arbitrator White]." (Docket No. 14, p. 2) (emphasis in original). KPI's complaints about Arbitrator White focus on certain of his procedural and substantive rulings.

traditional litigation because he limited the parties to calling only two live witnesses each, to be subject to cross-examination, and that if a party requested additional witnesses, then it "must *submit a summary* of that person's testimony *with their narrative submissions*." (Docket No. 1-9, ¶ 3; 12-27, ¶ 3) (emphasis added). This Order set a deadline of October 14, 2024, for Penneco to submit a narrative of its claims along with its exhibits and expert reports; and for KPI to submit its narrative of defenses, exhibits, and expert reports by October 24, 2024. (Docket Nos. 1, ¶ 42; 1-9, ¶¶ 1-2; 12-27, ¶¶ 1-2). This Order also scheduled the evidentiary hearing to commence on November 4, 2024. (Docket Nos. 1, ¶ 43; 1-9, ¶ 3; 12-27, ¶ 3).

KPI did not object to this Order. Indeed, it was consistent with KPI's requests that the arbitral process be streamlined. KPI itself cites and does not refute a statement made by Arbitrator White in his Award of Attorneys' Fees and Additional Damages, that "on several occasions during our pre-hearing conferences, [KPI] implored [Arbitrator White] to 'streamline' the dispute process and not adhere to conventional, formal litigation protocols or procedures." (Docket No. 12-23, p. 4).[8] Regardless, arbitrators have wide latitude in how they conduct proceedings. *Off. & Pro. Emps. Int'l Union, Loc. No. 471 v. Brownsville Gen. Hosp.*, 186 F.3d 326, 334–35 (3d Cir. 1999). *See*

---

[8] In addition to KPI's proposed hearing protocols, and long before the arbitration hearing itself, on June 16, 2023, counsel for KPI wrote to Arbitrator White to "address Penneco's urging 'formal litigation,' complete with 'documents and testimony' and evidentiary hearings.'" (Docket No. 1-19, p. 18). In doing so, KPI's counsel stated that the "sole purpose of [Arbitrator White's] appointment was to obviate 'formal litigation' . . . [and that] this matter should be resolved by [Arbitrator White] in a streamlined, efficient, and cost-effective manner . . . [and] not be by way of conventional litigation." (*Id.*, pp. 18-19). Then, a year later, on June 14, 2024, KPI's counsel wrote to Arbitrator White yet again, this time opposing Penneco's efforts to inspect the Hackett Field compressors, stating:

> To be sure, your appointment as the parties' consented special master was based upon [the parties'] desire for a more streamlined and efficient process to resolve disputes . . . the parties agreed to your appointment to avoid traditional litigation and its attendant costs and inefficiencies. The entire purpose of affording special master discretion to resolve disputes is defeated by Penneco pursuing formal proceeding, including its current 'discovery' demand, which is analogous to Pa.R.Civ.P. 4009.31 (request for entry upon property).

(*Id.*, p. 23).

*also Association of Flight Attendants v. USAir, Inc.*, 960 F.2d 345, 349 (3d Cir.1992) ("Once the parties are obligated to submit a dispute to arbitration, then 'procedural questions' growing out of the dispute and bearing on its final disposition are to be left to the arbitrator.").

KPI chose to proffer Mr. Khorrami and Mr Harton as its two live witnesses during the evidentiary hearing. That was its strategic and tactical choice. Then, notwithstanding Arbitrator White's clear and reasonable protocols for conducting the hearing, KPI sought to proffer the prior deposition testimony of Mr. Greco[9] even though KPI never submitted such additional non-live testimony via summary in advance of the hearing along with its pre-hearing narrative statement. KPI failed to follow that simple and reasonable directive. Penneco objected when KPI sought to read Mr. Greco's prior deposition testimony at the hearing. Arbitrator White sustained Penneco's objection because KPI could have proffered Mr. Greco as one of its two live witnesses but instead sought to proffer his testimony as an additional non-live witness but without abiding by Arbitrator White's established hearing protocols, and because his transcribed prior testimony is inadmissible hearsay of an "unavailable witness" pursuant to Fed. R. Evid. 804(a)(5)(A).

Arbitrator White acted well within his authority when establishing reasonable hearing protocols. Restricting both parties to two live witnesses was consistent with KPI's requests that the arbitral process be streamlined. Even so, it gave each side choices as which live witnesses it would present. KPI never objected to this hearing protocol. Moreover, KPI was given the opportunity to submit additional witness testimony so long as it submitted summaries of such

[9] Anticipating that KPI might proffer Mr. Greco as one of its two live witnesses, Penneco listed Mr. Greco's deposition transcript as one of its exhibits for non-hearsay purposes for use during possible cross examination. *See* Fed. R. Evid. 801(d)(1) (declarant-witness prior statements). KPI proffered two other live witnesses, not Mr. Greco, so Penneco never used Mr. Greco's deposition transcript at the hearing. Arbitrator White's hearing protocols required the parties to submit summaries of any additional non-live witnesses along with their pre-hearing narrative statements. It is specious for KPI to assert that one of Penneco's listed exhibits can somehow serve as its own proffered summary for a non-live witness's testimony pursuant to Arbitrator White's hearing protocols.

testimony with its pre-hearing narrative in advance of the hearing. Again, KPI did not object to this procedure but then failed to abide by it. Arbitrator White never prevented KPI from offering this evidence but he did expect KPI to abide by this established protocol for submitting it. Yet, KPI failed to follow such rules. Undeterred, KPI persisted in presenting Mr. Greco's testimony notwithstanding Arbitrator White's evidentiary ruling by including references to Mr. Greco's prior testimony in its Post-Hearing Summary. (Docket Nos. 1-13, at pp. 4-6, 9, 17; 12-19, at pp. 4-6, 9, 17; 12-19). Under these circumstances, Arbitrator White's ruling that Mr. Greco's deposition transcript would be excluded from the evidentiary hearing is reasonable and well within his arbitral authority, and thus is not a valid basis upon which to vacate the Arbitration Awards.

3. Did Arbitrator White Exceed His Authority, Commit "Misconduct," or Issue an Irrational Award by Failing to Apply "Hornbook Rules of Contract Law" or Awarding Damages "That Were Not Sought nor Established"?

KPI asserts that the Arbitration Awards should be vacated because, in its view, Arbitrator White misapplied "hornbook rules of contract law" and awarded damages that were not sought nor established. Once again, KPI fails to establish a meritorious basis to vacate the Arbitration Awards.

KPI argues to this Court that Arbitrator White exceeded his authority by failing to apply extant contract law requiring Penneco to mitigate damages concerning the second compressor. (Docket No. 13, at p. 24) (citing *Toyota Industrial Trucks U.S.A., Inc. v. Citizens Nat'l Bank*, 611 F.2d 465, 471 (3d Cir. 1979) (restating maxim that a party injured by a breach of contract is under a duty to mitigate his damages)). Upon closer inspection, however, KPI seems really to be arguing that Penneco implicitly waived its contractual rights relative to the second compressor because it purportedly knew about the installation of the second compressor but did not timely assert its contractual rights pertaining to it. (Docket No. 13, at pp. 24-25). These arguments, even if raised

in the arbitration itself, were given consideration during the arbitral process and are misplaced here.[10]

The role of the Court "is not to review the merits of the [arbitral] decision or correct factual or legal errors." *Dauphin Precision Tool v. United Steelworkers of America*, 338 Fed. Appx. 219, 222 (3d Cir. 2009) (citing *Major League Baseball Players Ass'n*, 532 U.S. at 509). As the Supreme Court put it, "[i]t is not enough . . . to show that the [arbitrator] committed an error – or even a serious error." *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 569 (2013) (citing *Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671, (2010)). This Court's limited judicial review "maintain[s] arbitration's essential virtue of resolving disputes straightaway" and "[i]f parties could take 'full-bore legal and evidentiary appeals,' arbitration would become 'merely a prelude to a more cumbersome and time-consuming judicial review process.'" *Oxford Health Plans LLC*, 569 U.S. at 568-569 (citing *Hall Street Associates, L.L.C. v*, 552 U.S. at 588). KPI lost the arguments it presented to Arbitrator White and now improperly seeks to relitigate those arguments here. Given its limited role of judicial review under the FAA, this Court will not disturb Arbitrator White's province of weighing the evidence, assessing witness credibility, interpreting the parties' governing contracts, and applying applicable contract law.

---

[10] Penneco asserts that KPI never raised this mitigation defense during the arbitration proceeding and contends that it thereby waives making that argument now. Judicial precedents generally hold that arguments not presented during the arbitration proceedings cannot serve as a basis to vacate an arbitral award. *See, e.g.*, *Amalgamated Meat Cutters & Butcher Workmen of N. Am., Local 195, AFL-CIO v. Cross Bros. Meat Packers, Inc.*, 518 F.2d 1113, 1121 n. 19 (3d Cir. 1975) ("a loser is not permitted for the first time to raise an objection to the arbitration panel after the award has been made."); *see also Stone v. Bear, Stearns & Co.*, 872 F. Supp. 2d 435, 454-55 (E.D. Pa. 2012). As for KPI's own implicit waiver argument, Penneco points to the contracts governing the parties' underlying dispute which contains a no-waiver provision. *See* Drilling and Operating Agreement, Section 18. (Docket Nos. 1-5; 12-2) ("No waiver by any party hereto of any default of or breach by any other party under this Agreement will operate as a waiver of any future default or breach, whether of like or different character or nature."). Arbitrator White himself noted that KPI did not assert arguments of estoppel, waiver, or modification until after the issuance of his Initial Award. (Docket No. 1-23).

4. Were Arbitrator White's Awards "Completely Irrational"?

KPI contends that Arbitrator White's Awards concerning the nature and extent of labor required to operate and maintain the compressors were "completely irrational." (Docket No. 13, pp. 27-31). Once again, KPI improperly seeks to relitigate its arbitration here.

First, KPI contends that Arbitrator White "blatantly and inaccurately applied the Farmout Agreement's requirement that 'cost of compression' be documented to the Drilling and Operating Agreement which maintains no 'documentation' requirement[.]" (Docket No. 13, p. 27). In pressing this argument, KPI speciously ignores the obvious, that is, the Farmout Agreement is attached to and incorporated into the Drilling and Operating Agreement and the Settlement Agreement is also incorporated into the Drilling and Operating Agreement. (Docket Nos. 1-3; 1-4; 1-5; 12-1; 12-2; 12-5)). Accordingly, Arbitrator White properly applied the contractual standard of "agreed upon actual documented cost of compression" rationally derived from Section 4(e) of the Drilling and Operating Agreement ("cost of operation and maintenance of the compressor") and Section 6 of the Farmout Agreement ("documented cost of compression"). (Docket Nos. 1-3; 1-4; 1-5; 1-14, ¶ 3; 12-1; 12-2; 12-5; 12-20, ¶ 3).[11]

KPI next contends that Arbitrator White's Final Award irrationally failed to "rebut the affirmative evidence proffered by KPI relative to the nature and extent of labor required to operate" the compressors. (Docket No. 13, p. 28). However, the parties' post-hearing submissions reflect evidence from which Arbitrator White rationally derived his conclusion that KPI overcharged Penneco. (Docket No. 1-12, pp. 9-16). For instance, Penneco proffered evidence of the prevailing

[11] By now, three federal judges and two arbitrators have reached this obvious conclusion. In addition to Arbitrators King and White, and this judicial officer, Judge Cercone also held that the Farmout Agreement and Drilling and Operating Agreement were integrated. (Civil Action No. 2:17-cv-1364, ECF No. 24, pp. 9-10). Judge Stickman reached the same conclusion. (Civil Action No. 2:18-cv-248, ECF No. 170, ¶¶ 6, 22, 68, 69, 88, 89).

rates in Western Pennsylvania for such services. It also proffered testimony from its expert, Mr. Schmitt, that KPI charged Penneco far more than its actual labor costs. KPI did not convince Arbitrator White of the merits of its arguments and now improperly seeks to relitigate its arbitration case again before this Court. Doing so is beyond the bounds of this Court's reviewing authority.

5. Is Arbitrator White's Attorneys' Fee Award "Completely Irrational"?

Finally, KPI challenges Arbitrator White's award of $195,811.50 in attorneys' fees and $69,595 in expert costs as being "completely irrational." (Docket No. 13, pp. 33-37). KPI contends that these amounts are not proportional and thus "excessive," and that Arbitrator White made this decision without any underlying evidentiary basis for the reasonableness of these fees and costs. (*Id.*). Once again, KPI seems to mischaracterize the arbitral record and improperly seeks to relitigate its losing arbitration arguments yet again.

Arbitrator White expressly found that the hours worked, and rates charged, by Penneco's attorneys were reasonable and "competitive in the legal community here in Western Pennsylvania." (Docket No. 1-23, p. 2, ¶ 1). This conclusion was derived from Penneco's Statement of Attorneys' Fees and Costs that set forth its counsels' hourly rates and described the tasks counsel performed (Docket No. 1-15), as well as from Penneco's subsequently submitted Reply to KPI's Response which proffered market-based support for its billing rates and detailed explanations of many billable tasks performed. (Docket No. 1-20). KPI's current arguments are merely repackaged from its failed arguments submitted to Arbitrator White. (Docket No. 17). A review of the arbitral record, once again, demonstrates that Arbitrator White's award of attorneys' fees and costs is rationally derived from the record evidence and from the parties' arguments presented to him. This Court will not disturb that decision.

## III. **Conclusion**

For the foregoing reasons, Defendant K. Petroleum, Inc.'s Motion to Vacate November 25, 2024 Award and January 27, 2025 Supplemental Award (Docket No. 12) is DENIED. Furthermore, the Court shall CONFIRM Arbitrator White's Final Award in Arbitration dated November 25, 2024 and his Award of Attorneys' Fees and Costs and Additional Damages Pursuant to the November 25, 2024 Final Award in Arbitration dated January 27, 2025. The Court shall enter judgement in favor of Plaintiffs Penneco Oil Company, Inc. and Penneco Pipeline Corporation.

A separate Order shall follow.

*/s W. Scott Hardy*
W. Scott Hardy
United States District Judge

cc/ecf: All counsel of record